IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RICOLE R. SHAWGO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CIVIL NO. 05-4173-GPM |
| ) | |
| GENERAL MOTORS CORPORATION, ) | |
| ) | |
| Defendant. ) | |

# MEMORANDUM AND ORDER

**MURPHY, Chief District Judge:**

This matter is before the Court on a motion to bar Plaintiff's expert (Doc. 59) and a motion for summary judgment (Doc. 57) filed by Defendant, General Motors Corporation (hereinafter "GM"). After conducting an evidentiary hearing on July 30, 2007, the Court took the motions under advisement. For the reasons set forth below, the Court bars the testimony of Plaintiff's expert, Anil Khadilkar, Ph.D., and grants summary judgment to GM.

### BACKGROUND

This personal injury lawsuit arises out of a motor vehicle accident which occurred in rural Perry County, Illinois, on September 28, 2003. Plaintiff, Ricole Shawgo, was ejected from her 1999 Chevrolet Cavalier and sustained serious injuries. In this lawsuit, she alleges that her vehicle was manufactured by GM with a defective and unreasonably dangerous seat belt. Specifically, Shawgo alleges that the vehicle's seat belt was designed so that it would not retain a passenger in the vehicle upon collision and would (and in fact did) disengage during a collision. Shawgo claims that she was wearing her seat belt at the time of the accident; GM's experts think otherwise. Nonetheless, it is

undisputed that Shawgo was not restrained by the seat belt when she was found by emergency personnel.

Shawgo asserts claims based on negligence, breach of implied warranty, breach of express warranty, and strict products liability.[1]  Because testing on the seat belt in the GM vehicle at issue in this case was not feasible, Shawgo's counsel conceded at the July 30th hearing that Shawgo will pursue only a theory of a design defect, not a manufacturing defect, at trial.  To support these claims, Shawgo's counsel intends to call Dr. Anil V. Khadilkar to opine on the alleged defective seat belt in the GM vehicle driven by Shawgo.

Dr. Khadilkar is an automotive engineer with an impressive curriculum vitae peppered with degrees, professional affiliations, employment experience, and publications (*see* Doc. 59-3).  His experience and education are not at issue.  Instead, GM moves to bar Dr. Khadilkar's testimony for the simple reason that his report and testimony are unreliable and his opinions are not generally accepted.

In his report prepared for this case, Dr. Khadilkar concludes:

> 1. The subject vehicle was driven by Ricole Shawgo.  She was wearing the 3-point safety restraint system available in the vehicle at her seating position at the time of the subject crash.
>
> 2. The rollover crash that the subject Cavalier underwent was a relatively low-energy, low-force, low roof crush event.

---

[1] The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  Shawgo is a citizen of Illinois (*see* Doc. 110); GM is a Delaware corporation with its principal place of business in Michigan (*see* Doc. 38).  Shawgo seeks in excess of $75,000, exclusive of interest and costs, in her third amended complaint, and the Court is satisfied that the amount in controversy requirement is met because it does not appear to a legal certainty that the claims are really for less than the jurisdictional amount.  *See Smith v. American General Life and Accident Ins. Co.*, 337 F.3d 888, 892 (7th Cir. 2003) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938)).

3. The occupant compartment integrity and the occupant safety zone stayed relatively undisturbed in the subject rollover.

4. The only exception to the relatively maintained occupant compartment integrity was the braking [sic] out of the left front door glass which opened up a portal for Ricole's ejection path.

5. The rollover crash of the subject vehicle resulted in serious injuries to Ricole Shawgo. Her injuries were as a result of her getting ejected from the vehicle and they occurred outside the vehicle.

6. The safety restraint system for the driver seating position underwent unwanted unlatching during the crash sequence, most likely before the rolling sequence.

7. The unlatching most likely occurred as a result of the latch plate unlatching since it was partially latched; or as a result of forceful contact between Ricole's body or some object in the vehicle and the release button of her safety restraint buckle and inadvertently releasing the latch.

8. The subject Cavalier, [sic] Ricole was riding in underwent a complex interaction of off-road travel, sliding, pitching, rolling and yawing motion during the subject crash.

9. The combination of the unwanted unlatching of the safety belt and the available portal for ejection during the rollover resulted in Ricole's ejection from the vehicle.

10. The safety belt systems in the subject 1999 Chevrolet Cavalier failed to provide Ricole the restraint-protection and contributed to her ejection and the resultant serious injuries.

11. Had the safety restraint system not unlatched, and had the side window glass not broken and had Ricole stayed within the vehicle's interior, it is highly unlikely that Ricole would have sustained her serious injuries.

12. It is my opinion that the OEM GMC/Takata safety restraint system Ricole was wearing in this crash was defective and unreasonably dangerous beyond the contemplation and expectations of an average consumer.

(*See* Doc. 74-8, p. 10-11)

At his deposition, Dr. Khadilkar's opinions regarding the product's defect were boiled down to three: (1) the subject seat belt had a tendency to false latch and falsely latched at the time of the accident ("false latch"); (2) there was some combination of false latch and inadvertent release of the seat belt at the time of the accident ("inadvertent release"); and (3) an inadvertent release occurred at the time of the accident ("inertial release").  (*See* Doc. 59-8, pp. 50-51)

GM moves to strike these opinions because Dr. Khadilkar fails to articulate the methodology he employed to reach these conclusions or to sufficiently describe the testing he performed. According to GM, the opinions "are not based on sufficient facts or data, are not the product of reliable principles and methods, and do not apply principles and methods reliably to the facts of this case." (*See* Doc. 59, p. 4)  GM argues that without Dr. Khadilkar's testimony, Shawgo has no evidence from which to argue that the seat belt was defectively designed.

## ANALYSIS

Motion to Bar Dr. Khadilkar

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993).  *See, e.g., Ancho v. Pentek Corp*., 157 F.3d 512, 515 (7th Cir. 1998); *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 344 (7th Cir. 1995).

> Rule 702 provides:
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion ... if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court specifically addressed the application of the analysis set forth in *Daubert* to experience-based, non-scientific expert testimony. The Supreme Court held that while a court's gate-keeping function under *Daubert* applies to all expert testimony, in the case of a non-scientific expert, "the relevant reliability concerns may focus upon personal knowledge or experience." *Kumho*, 526 U.S. at 150. The inquiry is "a flexible one," and the factors articulated in *Daubert* "do not constitute a 'definitive checklist or test.'" *Id*. (emphasis in the original). Rather, the inquiry "must be 'tied to the facts' of a particular 'case.'" *Id*. In other words, "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id*. In fact, the Supreme Court went on to recognize that not all of the *Daubert* factors necessarily apply even in a case where the reliability of scientific testimony is challenged. *Id*. The point is to ensure that an expert, "whether basing testimony upon professional studies or personal experience, employs in the court room the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152. Thus, the trial judge must determine whether the expert's opinion was grounded in the "methods and procedures of science," and whether such testimony had sufficient "factual underpinnings." *Bourelle v. Crown Equipment Corporation*, 220 F.3d 532, 536 (7th Cir. 2000) (citations omitted).

The Seventh Circuit, interpreting *Daubert*, has established that when evaluating the admissibility of proffered expert testimony, district courts are to undertake a two-step inquiry:

> *Daubert* first "directs the district court to determine whether the expert's testimony pertains to scientific knowledge. This task requires that the district court consider whether the testimony has been subjected to the scientific method; it must rule out 'subjective belief or unsupported speculation.'" Second, the district court must "determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue. That

>       is, the suggested scientific testimony must 'fit' the issue to which the
>       expert is testifying."

*O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir. 1994) (*quoting Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 613 (7th Cir. 1993) (citations omitted)).

*Daubert* requires district courts to perform a gate-keeping function as to evidence offered by expert witnesses, to "ensure the reliability and relevancy of expert testimony." *Kumho*, 526 U.S. at 152. A district court should consider certain criteria in deciding whether testimony satisfies *Daubert*, including these five nonexclusive guideposts: (1) whether the proffered testimony (or the theoretical framework or technique underlying it) is subject to verification through testing, (2) whether the testimony/technique has been subjected to peer review and publication, (3) what its known or potential rate of error is, (4) whether there are standards controlling its application, and (5) whether it is generally accepted within the relevant expert community. *Mihailovich v. Laatsch*, 359 F.3d 892, 918-19 (7th Cir. 2004); *Deimer*, 58 F.3d at 344. These five factors should be flexibly applied, depending on the type of expert testimony at issue. *Mihailovich*, 359 F.3d at 919.

Evidence adduced at the July 30th hearing established that Dr. Khadilkar's "testing" for a "false latch" defect in this case consisted of brief testing on two exemplar belts from a 1999 Chevrolet Cavalier.[2] The exemplars were taken from two unrelated vehicles found in two different junk yards. There is no information available concerning the history of those vehicles or the circumstances that led them to the junk yard, *i.e.* their crash history and whether such history might impact seat belt

---

[2] Dr. Khadilkar also "tested" the seat belt from Shawgo's vehicle during his inspection of the 1999 Chevrolet Cavalier by attempting to latch the belt five or six times. According to his deposition testimony, the belt "false latched" three or four of those times, but he has no written documentation of this test, and he did not videotape or photograph the testing. (*See* Doc. 59-9, pp. 80-81.) Shawgo's counsel conceded at the July 30th hearing that this testing is insufficient under *Daubert*.

performance.

First, the Court notes that Dr. Khadilkar is not even able to say with certainty which of the three possible failures mentioned above occurred in this case, and he does not identify a defective mechanism in the seat belt. Dr. Khadilkar's opinion that the belt had a tendency to "false latch" is not supported by any data, and his methodology is suspect. Dr. Khadilkar testified at the evidentiary hearing that literature supports his testing method, but he was unable to produce or cite to any. He did not record how many times he did the test, he was unable to repeat the testing, and even his recollections of what he did are sketchy (*see* Doc. 59-10, pp. 149-151). His testing does not appear to be representative of actual use of a seat belt, and he did not measure the maximum force of separation as dictated by Federal Motor Vehicle Safety Standard Section 209.S5.2. And, although Dr. Khadilkar did eventually reproduce his testing on video, the video was not provided to GM until after the instant motion to bar was filed – long after he was deposed and the deadline for discovery passed.

The opinions relating to "inadvertent unlatch" are not much better. As Judge Easterbook has noted, "[t]he question is not whether it is 'possible' for something untoward to occur during an accident but whether 'the design creates unreasonable danger' according to 'general negligence principles.'" *Pries v. Honda Motor Co.*, 31 F.3d 543, 545 (7th Cir. 1994) (*citing Miller v. Todd*, 551 N.E.2d 1139, 1141 (Ind. 1990); *Bammerlin v. Navistar Int'l Transp. Co.*, 30 F.3d 898 (7th Cir. 1994)). Although Dr. Khadilkar did perform some testing with respect to this theory (he rolled balls of various sizes along the release buckle to determine whether the belt would unlatch), the testing was only performed on the two junk yard exemplars.

Dr. Khadilkar's opinions are nothing more than subjective belief and unsupported conjecture that fail to rise to the level of reliability required under the standards set forth in *Daubert* and its

progeny. *See Bourelle*, 220 F.3d at 537 ("Where the proffered expert offers nothing more than a 'bottom line' conclusion, he does not assist the trier of fact.") (*citing Clark v. Takata Corp.,* 192 F.3d 750, 756 (7th Cir. 1999)).  Stated another way, Dr. Khadilkar's opinions have not been tested via the scientific method and are merely the product of "subjective belief or unsupported speculation." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002).  Dr. Khadilkar's testimony does not satisfy the standards imposed by *Daubert*, its progeny, and Seventh Circuit case law.

Motion for Summary Judgment

Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  In considering a summary judgment motion, a court must review the entire record and draw all reasonable inferences in the light most favorable to the non-moving party.  *See NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Enquip, Inc. v. Smith-McDonald Corp.*, 655 F.2d 115, 118 (7th Cir. 1981).

In Illinois, "a plaintiff raising a negligence claim must do more than simply allege a better design for the product; he must plead and prove evidence of a standard of care by which to measure a defendant's design and establish a deviation from that standard." *Blue v. Environmental Eng'g, Inc.*, 828 N.E.2d 1128, 1141 (Ill. 2005).  In *Blue*, the Illinois Supreme Court set forth what a plaintiff proceeding under a negligence theory of product defect must prove:

> [T]o establish a negligence claim for a defective design of a product, a plaintiff must prove that either (1) the defendant deviated from the standard of care that other manufacturers in the industry followed at the time the product was designed, or (2) that the defendant knew or should have known, in the exercise of ordinary care, that the product was unreasonably dangerous and defendant failed to warn of its dangerous propensity.

*Blue*, 828 N.E.2d. at 1141 (*citing Carrizales v. Rheem Mfg. Co.*, 589 N.E.2d 569 (Ill. App. Ct. 1991); *Baltus v. Weaver Div. of Kidde & Co.*, 557 N.E.2d 580 (Ill. App. Ct. 1990)).

In this case, Shawgo has offered no standard of care evidence. Even with the testimony of Dr. Khadilkar, she could not meet this requirement of her case. Similarly, there is no evidence before the Court that GM knew or should have known that the subject seat belt was unreasonably dangerous and failed to warn of the danger. For these reasons, Shawgo's negligence claim fails.

As stated above, Shawgo has abandoned any claim for manufacturing defect and is proceeding only under a theory of design defect.

> In contrast to negligence's focus on the standard of care established by other manufacturers in the industry, strict liability focuses on the product and only requires proof that the benefits of the challenged design do not outweigh the risk of danger inherent in such designs, that the alternative design would have prevented the injury, and that the alternative design was feasible in terms of costs, practicality[,] and technology.

*Blue*, 828 N.E.2d at 1142 (*citing Hansen v. Baxter Healthcare Corp.*, 764 N.E.2d 35 (Ill. App. Ct. 2002)). Dr. Khadilkar is the only expert identified by Shawgo to offer opinions that the subject seat belt was defective and unreasonably dangerous. For the reasons stated above, his testimony is not admissible, and there is no other evidence to show a jury that the seat belt system is defective. Moreover, Dr. Khadilkar, even if he were allowed to testify, cannot identify an alternative design that would have prevented the harm that befell Shawgo.

Shawgo argues that it is not necessary for her to present expert testimony that there was a defect in GM's product because this is not a case where the alleged defect is beyond the common knowledge of the average juror, relying on *Tweedy v. Wright Ford Motor Sales*, 357 N.E.2d 449 (Ill. 1976). In *Tweedy*, the plaintiff alleged that the brakes failed in the automobile he was driving. A witness testified that after the accident he observed the emergency brake jammed into the carpet

of the vehicle. There were no other explanations for the single car accident, *i.e.* the weather was clear, the road was dry, and the plaintiff was familiar with the intersection where the accident occurred. The Supreme Court noted that "[a] [p]rima facie case that a product was defective and that the defect existed when it left the manufacturer's control is made by proof that in the *absence of abnormal use or reasonable secondary causes* the product failed 'to perform in the manner reasonably expected in light of (its) nature and intended function.'" *Id.* at 452 (internal citations omitted, emphasis added). In this case, as GM points out, there are reasonable secondary causes for why Shawgo was not restrained by the belt, including her admission to an emergency room nurse that she was not wearing it.

This case is also not like *Lindroth v. Walgreen Company*, another case relied upon by Shawgo, where a vaporizer in a baby's room caught fire and burned into a heap of plastic and metal. *See* 94 N.E.2d 847, 852 (Ill. 1950). In *Lindroth*, the Illinois Supreme Court noted, "[o]bviously, if the vaporizer had been in the same condition after the fire as it was in before, then an inference of defect would be pure conjecture [sic] and the jury could not have reached such a conclusion." *Id.* at 853. In this case, there is nothing, without expert testimony, to explain to a jury that Shawgo was not restrained by the seat belt because of a defect in the belt. In other words, there is no smoking gun such as a jammed brake or a melted vaporizer.

Finally, to succeed on her warranty claims, Shawgo bears the burden of proving by a preponderance of the evidence "the terms of the warranty, the failure of some warranted part, a demand upon the defendant to perform under the terms of the warranty, a failure of the defendant to do so, a compliance with the terms of the warranty by the plaintiff, and damages measured by the terms of the warranty." *Hasek v. DaimlerChrysler Corp.*, 745 N.E.2d 627, 638 (Ill. App. Ct. 2001) (*citing Haas v. Buick Motor Div. of General Motors Corp.*, 156 N.E.2d 263 (Ill. App. Ct. 1959)).

Because she is unable to prove that GM's product was defective, Shawgo's warranty claims likewise fail as a matter of law. *See Collum v. Fred Tuch Buick*, 285 N.E.2d 532, 536 (Ill. App. Ct. 1972) (noting that a plaintiff "must prove that the alleged malfunctioning . . . was caused by a defect in the parts or workmanship, and that the manufacturer failed to repair or replace the parts in accordance with the warranty."); *see also Oggi Trattoria and Caffe, Ltd. v. Isuzu Motors America, Inc.*, 865 N.E.2d 334, 360 (Ill. App. Ct. 2007).

Shawgo has had adequate time and opportunity to introduce the necessary evidence and to find the necessary experts to establish her case. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 722 (7th Cir. 2000). Having failed to do so, summary judgment is proper.

## CONCLUSION

Accordingly, Defendant's motion to bar expert (Doc. 59) is **GRANTED**, Defendant's motion for summary judgment (Doc. 57) is **GRANTED**, and this action is **DISMISSED on the merits**. The Clerk is **DIRECTED** to enter judgment accordingly, and the parties shall bear their own costs.

All pending motions are **DENIED as moot**.

**IT IS SO ORDERED.**

DATED: 8/9/07

s/ *G. Patrick Murphy*
G. Patrick Murphy
Chief United States District Judge